IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

AUGUSTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR 119-096 |
| | ) | |
| ANTWON DOMINIQUE BRINSON | ) | |

_____

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**
_____

Defendant seeks suppression of drug and firearm evidence obtained during a traffic stop on April 27, 2019.  After careful consideration of the legal briefs and evidence presented at the hearing on November 1, 2019, the Court **REPORTS** and **RECOMMENDS** Defendant's motion to suppress, (doc. no. 17), be **GRANTED** because the officer prolonged the stop to investigate unrelated crimes without reasonable suspicion.

**I.    FACTS**

On August 7, 2019, the grand jury in the Southern District of Georgia charged Defendant with possessing cocaine, marijuana, and a firearm as a felon.  (Doc. no. 1.)  On April 27, 2019, at 10:54 p.m., Deputy Johnny Snider from the Richmond County Sheriff's Office pulled over Defendant because of a defective brake light.  (Court's recording system, *For the Record* ("FTR"), 10:22:20-10:22:30.)  At the suppression hearing, Deputy Snyder explained the steps essential to completing such a routine traffic stop as follows:

> We would pull the vehicle over, approach the vehicle, make contact with the driver, [and] get the driver's license.  If the driver can provide us his driver's license, we would go back to our vehicle [and] do a driver's license and warrants check.  At that time we would approach back to the vehicle and explain we are going to issue a verbal warning, written warning, or a citation.

(FTR 10:39:57-10:40:25.) Deputy Snyder added he must also check the vehicle's tag number. (FTR 10:39:57-10:40:25.) The driver's license and warrant checks occur simultaneously because a single computer search produces results from Georgia Crime Information Center, National Crime Information Center, and Richmond County. (FTR 10:39:57-10:40:25.)

When Deputy Snyder first pulled over Defendant, he exited the patrol car, approached Defendant's vehicle, explained the reason for the stop, obtained Defendant's driver's license, returned to his patrol car, and conducted the driver's license and warrant checks. (FTR 10:07:43-10:07:58.) Defendant had no outstanding warrants but did have a prior drug arrest in Richmond County for which no disposition information was available. (FTR 10:23:17-10:24:24.) Because of Defendant's prior drug arrest, Deputy Snyder testified he suspended completion of the steps essential to issuing Defendant a traffic citation for the defective brake light so that he could investigate the possibility of Defendant possessing drugs. (FTR 10:42:38-10:43:06.) Setting aside the tag number search and completion of the citation, Deputy Snyder exited his patrol car, turned on his body camera, and returned to Defendant's vehicle. (FTR 10:07:58-10:08:03, 10:42:12-10:42:52.)

The body camera footage begins with the following exchange:

| | |
|---|---|
| Deputy Snyder: | "What does you got in the car man cause you acting, you acting all, all nervous?" |
| Defendant: | *Defendant shakes head and mumbles/inaudible* |
| Deputy Snyder: | "What do you got? You got a little bit of something?" |
| Defendant: | *Defendant shaking his head.* "No, sir." |

2

  Deputy Snyder:  "Ok, where you stay at?"

  Defendant:  "I stay off 56, I stay right there sir."

(Body Camera, doc. no. 27-2, 00:00-00:40.)  Deputy Snyder testified he perceived Defendant was nervous during this exchange because "he was mumbling, looking down.  Then he would look up at me.  And when I would ask him questions, it looked like he was hesitating to give me an answer."  (FTR 10:22:51-10:23:14.)

  Deputy Snyder called for a canine unit while Defendant called his girlfriend to request her presence at the scene.  (Body Camera, 00:45-01:30; FTR 10:12:08-10:14:25.)  Deputy Snyder asked Defendant again if he had "something" in the car, and Defendant hesitated, then admitted he did.  (Body Camera, 01:35-01:44.)  Deputy Snyder asked Defendant what was in the car, and Defendant admitted to having "weed."  (Id. at 01:45-02:00.)  This admission occurred one minute and forty seconds after Deputy Snyder turned on his body camera.  Deputy Snyder asked multiple questions about the drugs in Defendant's car, and Defendant answered them all.  (Id. at 02:00-02:22.)  Apparently because of Defendant's admission, Deputy Snyder called off the canine unit.  (Id. at 02:23-02:30.)

  Deputy Snyder continued asking questions about the drugs, and Defendant answered all of them.  (Id. at 02:30-03:45.)  Deputy Snyder escorted Defendant out of his car and handcuffed him, then searched the car and found "a little bag of marijuana, some cocaine, and some pills—oxycodone pills."  (FTR 10:25:59-10:26:40.)  Deputy Snyder patted down Defendant and asked if there were any guns in the car.  (Body Camera, 09:40-10:10.)  Defendant stated there was a gun, describing its location, and Deputy Snyder retrieved it.  (Id. at 10:10-11:00.)  Deputy Snyder testified he inquired about the presence of guns in the

car to ensure the safety of law enforcement officers and anyone who took possession of the vehicle, and it is his custom and practice to check cars of apprehended suspects regardless of whether the suspect states there is a gun in the vehicle. (FTR 10:30:06-10:30:38, 10:32:57-10:33:04.) Deputy Snyder never Mirandized Defendant despite his training to do so at the time of arrest. (See Body Camera, 00:00-30:17; FTR 10:43:41-10:44:00.) After arresting Defendant, Deputy Snyder completed the traffic stop by conducting a computer check of the tag number and completing a traffic citation for the defective brake light. (FTR 10:38:51-10:39:02.)

## II. DISCUSSION

Defendant seeks suppression of the drugs, firearm, and related statements, contending Deputy Snyder violated the Fourth Amendment by suspending tasks necessary to complete the traffic stop to investigate possible drug crimes, without reasonable suspicion, upon discovering Defendant's prior drug arrest. The government argues no Fourth Amendment violation occurred because Defendant was lawfully stopped for a traffic violation and the duration and scope of the stop were reasonable. Defendant alternately seeks suppression of the firearm and related statements, contending Deputy Snyder violated the Fifth Amendment by failing to Mirandize him at the time of his arrest and prior to questioning him concerning guns. The government argues Deputy Snyder already had probable cause to search the vehicle at the time of the questions about guns. Because the Court finds a Fourth Amendment violation, it need not consider Defendant's Fifth Amendment challenge.

### A. The Officer Violated the Fourth Amendment by Prolonging the Traffic Stop to Ask Unrelated Questions Without Reasonable Suspicion

A traffic stop may last no longer than is necessary to address the traffic violation and related safety concerns. United States v. Campbell, 912 F.3d 1340, 1350 (11th Cir. 2019). "An officer . . . may conduct certain unrelated checks during an otherwise lawful traffic stop. But . . . he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." Rodriguez v. United States, 135 S. Ct. 1609, 1615 (2015); see also Campbell, 912 F.3d at 1351. The Supreme Court in Rodriguez differentiated between "'ordinary inquiries incident to a traffic stop' [and] unrelated tasks . . . 'aimed at detecting criminal activity more generally.'" Campbell, 912 F.3d at 1351 (quoting United States v. Green, 897 F.3d 173, 179 (3d Cir. 2018)). Ordinary inquiries incident to a traffic stop include checking the driver's license, checking for outstanding warrants against the driver, inspecting the vehicle's registration and insurance, and asking questions about travel plans. Rodriguez, 135 S. Ct. at 1615; Campbell, 912 F.3d at 1354. Unrelated inquiries that impermissibly prolong the traffic stop absent reasonable suspicion include, for example, questions concerning whether the driver is transporting counterfeit merchandise, illegal drugs, or dead bodies. Campbell, 912 F.3d at 1354-55.

Rodriguez and Campbell changed the landscape. Gone are the days when officers could question drivers about criminal activity unrelated to the traffic stop so long as they did not measurably prolong the duration of the stop. Id. at 1352. An officer can no longer gain "bonus time" to ask questions unrelated to the stop by completing traffic-related tasks expeditiously. Id. Even one unrelated question adding a few seconds to the stop's duration

5

constitutes a violation because diligence in completing a traffic stop expeditiously "does not provide an officer with cover to slip in a few unrelated questions." Id. at 1353.  Furthermore, it no longer matters that the officer inserted unrelated questions into the traffic stop before issuing the citation and concluding the traffic stop.  Id.  "[T]he critical question is not whether the unrelated inquiry occurs before or after the officer issues the ticket but whether conducting the unrelated inquiry 'prolongs' – i.e., adds time to 'the stop.'"  Id. (alterations in original) (quoting Rodriguez, 135 S. Ct. at 1616).

In this relatively new legal landscape, Deputy Snyder violated the Fourth Amendment by delaying the vehicle tag check and citation issuance and prolonging the stop while he exited his patrol car and asked Defendant questions to determine whether he was transporting illegal drugs.  (See FTR 10:42:56-10:43:06.)  Even though only one minute and forty seconds elapsed from the moment Deputy Snyder exited his patrol car until Defendant admitted possession of marijuana, this unconstitutionally prolonged the traffic stop and exceeded its narrow purpose.  In Rodriguez, the Supreme Court rejected any *de minimis* time argument and held prolonging a stop seven to eight minutes for a dog sniff was unlawful. Rodriguez, 135 S. Ct. at 1613.  In Campbell, the Eleventh Circuit held prolonging a stop twenty-five seconds to ask unrelated questions concerning criminal activity was unconstitutional.  Campbell, 912 F.3d at 1353.

Deputy Snyder did not have reasonable suspicion to investigate possible drug crimes. The Court must evaluate the "totality of the circumstances" to determine whether there was a "particularized and objective basis" for suspecting legal wrongdoing.  United States v. Arvizu, 534 U.S. 266, 273 (2002); see also United States v. Williams, 619 F.3d 1269, 1271

(11th Cir. 2010) (same). Stated otherwise, reasonable suspicion "takes into account 'the totality of the circumstances – the whole picture.'" Navarette v. California, 572 U.S. 393, 397 (2014). Assessing the whole picture "does not deal with hard certainties, but with probabilities." United States v. Cortez, 449 U.S. 411, 418 (1981); see also United States v. Lewis, 674 F.3d 1298, 1304 (11th Cir. 2012). Reasonable suspicion "need not rule out the possibility of innocent conduct," but rather depends on a commonsense approach based on "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Navarette, 572 U.S. at 402 (internal quotations omitted).

The sole fact prompting Deputy Snyder to suspend the traffic stop and inquire about drug possession was Defendant's prior drug arrest, and for that arrest no disposition information was available. Prior criminal history is insufficient by itself to create reasonable suspicion. See United States v. Bishop, 940 F.3d 1242, 1249-50 n.4 (11th Cir. 2019) (explaining criminal history alone has "little weight" but "when viewed in totality with the other relevant factors . . . could cause a reasonable officer to have heightened safety concerns."); United States v. Bentley, 151 F. App'x 824, 829 (11th Cir. 2005) ("Criminal history *alone* is insufficient to give rise to the necessary reasonable suspicion."); United States v. Santos, 403 F.3d 1120, 1132 (10th Cir. 2005) (holding criminal history alone does not give rise to reasonable suspicion). As the Tenth Circuit explained in Santos, "[e]ven people with prior convictions retain Fourth Amendment rights; they are not roving targets for warrantless searches." 403 F.3d at 1132. This conclusion applies more forcefully here because Deputy Snyder had no information to suggest a prior drug conviction, but instead only a prior drug arrest with no disposition information available. See United States v.

7

Harris, 347 F. Supp. 3d 1233, 1239-40 (S.D. Fla. 2018) (holding prior drug arrest did not "contribute[] substantially to creating a reasonable suspicion of criminal activity").

While the government claims Defendant's nervousness also prompted the inquiry, Deputy Snyder never testified Defendant appeared nervous during their first conversation at the beginning of the traffic stop. Instead, Deputy Snyder testified Defendant appeared nervous at the outset of their second conversation, after Deputy Snyder had already suspended the traffic stop and began asking Defendant questions concerning unrelated crimes. (FTR 10:42:38-10:43:06; Body Camera, 00:00-00:40.) Even if Deputy Snyder had noticed Defendant's nervousness before he made the decision to suspend the traffic stop to ask questions about drug possession, a prior drug arrest coupled with nervousness is not enough[1] and together form no more than an "inchoate hunch," "that could plausibly describe the behavior of a large portion of the motorists engaged in travel upon our interstate highways." United States v. Tapia, 912 F.2d 1367, 1371 (11th Cir. 1990).

---

[1] See Harris, 347 F. Supp. 3d at 1239-40 (finding no reasonable suspicion based on prior drug arrest, nervousness, and presence in city with high crime rate); see also United States v. Perkins, 348 F.3d 965, 971 (11th Cir. 2003) (finding no reasonable suspicion where defendant was nervous, had Florida driver's license despite claiming to live in Alabama, and his stated purpose for travel differed from statement of companion); United States v. Tapia, 912 F.2d 1367, 1371 (11th Cir. 1990) (finding no reasonable suspicion based merely on suspects being Mexican, having few pieces of luggage, being visibly nervous or shaken, traveling on interstate in Alabama with Texas license plates, and driving car insured by third party); cf. Bishop, 940 F.3d at 1249-50 (finding reasonable suspicion based on prior criminal history and nervousness when combined with agitation, defensiveness, refusal to comply with officer orders to exit vehicle, and arrest of person earlier in day with heroin who was traveling to defendant's residence); United States v. Simms, 385 F.3d 1347, 1354-55 (11th Cir. 2004) (finding reasonable suspicion based on not just prior drug arrest and nervousness but also BOLO alert for defendant's vehicle because of suspected drug transportation and defendant's suspicious story "about going to the VA hospital in Texas instead of one closer to his home in West Palm Beach, Florida").

### B. The Exclusionary Rule Requires Suppression of All Drug and Firearm Evidence Obtained During the Traffic Stop

The judicially created remedy known as the exclusionary rule acts as a deterrent to Fourth Amendment violations by prohibiting admission of the resulting evidence. United States v. Martin, 297 F.3d 1308, 1312 (11th Cir. 2002). However, "[t]he fact that a Fourth Amendment violation occurred . . . does not necessarily mean that the exclusionary rule applies." Herring v. United States, 555 U.S. 135, 140 (2009) (citing Illinois v. Gates, 462 U.S. 213, 223 (1983)). "Indeed, exclusion 'has always been our last resort, not our first impulse.'" Id. (quoting Hudson v. Michigan, 547 U.S. 586, 591 (2006)). To warrant exclusion, "the benefits of deterrence must outweigh the costs," and the principal cost is "letting guilty and possibly dangerous defendants go free—something that offends basic concepts of the criminal justice system." Id. at 141 (citations and internal quotations marks omitted). "Police practices trigger the harsh sanction of exclusion only when they are deliberate enough to yield 'meaningful' deterrence, and culpable enough to be 'worth the price paid by the justice system.'" Davis v. United States, 564 U.S. 229, 240 (2011) (quoting Herring, 555 U.S. at 144).

The Court would not apply the exclusionary rule if Deputy Snyder prolonged the traffic stop "in objectively reasonable reliance on binding appellate precedent." Campbell, 912 F.3d at 1355 (quoting Davis, 564 U.S. at 232).

> [W]hen binding appellate precedent specifically *authorizes* a particular police practice, well-trained officers will and should use that tool to fulfill their crime-detection and public-safety responsibilities. An officer who conducts a search in reliance on binding appellate precedent does no more than "act as a reasonable officer would and should act" under the circumstances.

Davis, 564 U.S. at 241 (quoting United States v. Leon, 468 U.S. 897, 920 (1984)).

Deputy Snyder's conduct did not conform to binding appellate precedent. On the contrary, Rodriguez and Campbell prohibited Deputy Snyder from prolonging the traffic stop in the absence of reasonable suspicion of a crime other than the traffic violation. Defendant's traffic stop occurred on April 27, 2019, four years after Rodriguez and four months after Campbell. "Responsible law enforcement officers will take care to learn 'what is required of them' under Fourth Amendment precedent and will conform their conduct to these rules." Id. (quoting Hudson, 547 U.S. at 599). Accordingly, while exclusion is a remedy to be applied sparingly, binding precedent leaves the Court no choice but to apply it here. As the Eleventh Circuit remarked in Campbell, "[n]ormally, if an officer unlawfully prolongs a stop, any evidence uncovered as a result would be suppressed." Campbell, 912 F.3d at 1355.

### III. CONCLUSION

The Court **REPORTS** and **RECOMMENDS** Defendant's motion to suppress be **GRANTED**. (Doc. no. 17.) All drug and firearm evidence obtained during the traffic stop, including incriminating statements, should be suppressed and inadmissible at trial.

SO REPORTED and RECOMMENDED this 4th day of December, 2019, at Augusta, Georgia.

_____
BRIAN K. EPPS
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA